O

JS - 6

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | | |
|---|---|---|
| EDEN FILM PRODUCTION LLC, | ) | Case No. CV 24-09851 DDP (SKx) |
| Plaintiff, | ) | |
| | ) | **ORDER GRANTING DEFENDANTS' MOTION TO DISMISS** |
| v. | ) | |
| | ) | |
| LOCKJAW LLC, et al., | ) | [Dkt. 27] |
| | ) | |
| Defendants. | ) | |
| _____ | ) | |

Presently before the court is a Motion to Dismiss (Dkt. 27) filed by defendants Lions Gate Entertainment, Inc., Showtime Networks, Inc., Beer Christmas, Ltd., Ashley Lyle, and Bart Nickerson (collectively, "Defendants"). Having considered the submissions of the parties and heard oral argument, the court grants the motion and adopts the following Order.

**I.    Background**

In 2015, Plaintiff Eden Film Production LLC ("Plaintiff") registered a motion picture copyright for the feature film "Eden" ("the Movie"). (Complaint at 1.) As described in more detail herein, the Movie is a "survival thriller about a U.S. men's soccer

1  team that crashes on a deserted island after a World Cup match."[1]

2  (Complaint ¶ 22.)  As alleged in the Complaint, "the survivors

3  . . . must fight for their lives against the harsh elements,

4  starvation through dwindling resources, and the psychological toll

5  of isolation in the form of growing darkness within themselves."

6  "Yellowjackets" is a television show written, produced, and

7  distributed by Defendants.  As detailed below, the show revolves

8  around a high school girls' soccer team that crashes in the

9  Canadian wilderness en route to a match.

10       Plaintiff's Complaint alleges that Yellowjackets is

11  substantially similar to and derivative of the Movie.  Accordingly,

12  Plaintiff brings a claim for copyright infringement, pursuant to 17

13  U.S.S. §§ 101 et seq.  Defendants now move to dismiss the

14  Complaint.

15  **II.  Legal Standard**

16       A complaint will survive a motion to dismiss when it

17  "contain[s] sufficient factual matter, accepted as true, to state a

18  claim to relief that is plausible on its face."  Ashcroft v. Iqbal,

19  556 U.S. 662, 678 (2009)(quoting Bell Atl. Corp. v. Twombly, 550

20  U.S. 544, 570 (2007)).  When considering a Rule 12(b)(6) motion, a

21  court must "accept as true all allegations of material fact and

22  must construe those facts in the light most favorable to the

23  plaintiff."  Resnick v. Hayes, 213 F.3d 443, 447 (9th Cir. 2000).

24  Although a complaint need not include "detailed factual

25  allegations," it must offer "more than an unadorned,

26

27  ────────────────

        [1] This Order contains several "spoilers," or descriptions of
28  plot points, some of them violent and gruesome, for the Movie and
    the television series "Yellowjackets."

1  the-defendant-unlawfully-harmed-me accusation." <u>Iqbal</u>, 556 U.S. at

2  678.  Conclusory allegations or allegations that are no more than a

3  statement of a legal conclusion "are not entitled to the assumption

4  of truth." <u>Id.</u> at 679. In other words, a pleading that merely

5  offers "labels and conclusions," a "formulaic recitation of the

6  elements," or "naked assertions" will not be sufficient to state a

7  claim upon which relief can be granted.  <u>Id</u>. at 678 (citations and

8  internal quotation marks omitted).

9      "When there are well-pleaded factual allegations, a court

10 should assume their veracity and then determine whether they

11 plausibly give rise to an entitlement of relief." <u>Iqbal</u>, 556 U.S.

12 at 679.  Plaintiffs must allege "plausible grounds to infer" that

13 their claims rise "above the speculative level." <u>Twombly</u>, 550 U.S.

14 at 555-56.  "Determining whether a complaint states a plausible

15 claim for relief" is "a context-specific task that requires the

16 reviewing court to draw on its judicial experience and common

17 sense." <u>Iqbal</u>, 556 U.S. at 679.

18 **III. Discussion**

19     A copyright infringement claim must adequately allege "(1)

20 ownership of a valid copyright, and (2) copying of constituent

21 elements of the work that are original."  <u>Feist Pubs., Inc. v.</u>

22 <u>Rural Tel. Serv. Co., Inc.</u>, 499 U.S. 340, 361 (1991).  In the

23 absence of direct copying, a copyright complaint must allege that

24 (1) the infringer had access to the protected work and (2) the

25 works are substantially similar in their protected elements.  <u>Funky</u>

26 <u>Films, Inc. v. Time Warner Entm't Co., L.P.</u>, 462 F.3d 1072, 1076

27 (9th Cir. 2006); <u>Cavalier v. Random House</u>, Inc., 297 F.3d 815, 822

28 (9th Cir. 2002); <u>Wild v. NBC Universal, Inc.</u>, 788 F.Supp.2d 1083,

1  1098 (C.D. Cal. 2011), aff'd 513 F. App'x 640 (9th Cir. 2013).

2  Defendants, without conceding that access has been adequately

3  alleged, here contend only that the Complaint fails to sufficiently

4  allege substantial similarity of protected elements.

5      A.   Comparisons at the Pleading Stage

6      As an initial matter, Plaintiff asserts that inquiries into

7  substantial similarity are inappropriate at the motion to dismiss

8  stage, and should instead be reserved for summary judgment.  (Opp.

9  at 5.)  It is well settled, however, "that when the copyrighted

10 work and the alleged infringement are both before the court,

11 capable of examination and comparison, non-infringement can be

12 determined on a motion to dismiss."  Christianson v. W. Pub. Co.,

13 149 F.2d 202, 203 (9th Cir. 1945).  Indeed, courts in this district

14 regularly conduct infringement analyses at the pleading stage.

15 See, e.g., Silas v. Home Box Off., Inc., 201 F. Supp. 3d 1158, 1171

16 (C.D. Cal. 2016), aff'd, 713 F. App'x 626 (9th Cir. 2018); Wild,

17 788 F. Supp. 2d at 1098; Campbell v. Walt Disney Co., 718 F. Supp.

18 2d 1108 (N.D. Cal. 2010).

19     That said, substantial similarity analyses are comprised of

20 two parts, only one of which is amenable to resolution on a motion

21 to dismiss.  "The 'intrinsic test' is a subjective comparison that

22 focuses on whether the ordinary, reasonable audience would find the

23 works substantially similar in the total concept and feel of the

24 works."  Cavalier v. Random House, Inc., 297 F.3d 815, 822 (9th

25 Cir. 2002) (internal quotation marks omitted).  Given that

26 subjectivity, the intrinsic test "is the exclusive province of the

27 jury."  Funky Films, 462 F.3d at 1077; see also Rentmeester v.

28 Nike, Inc., 883 F.3d 1111, 1118 (9th Cir. 2018), overruled on other

4

grounds by <u>Skidmore as Tr. for Randy Craig Wolfe Tr. v. Led
Zeppelin</u>, 952 F.3d 1051 (9th Cir. 2020) ("Only the extrinsic test's
application may be decided by the court as a matter of law.").  The
"extrinsic test," in contrast, "is an objective comparison of
specific expressive elements [that] focuses on articulable
similarities between the plot, themes, dialogue, mood, setting,
pace, characters, and sequence of events in two works." <u>Cavalier</u>
297 F.3d at 822 (internal quotation marks omitted); <u>see also</u> <u>Funky
Films</u>, 462 F.3d at 1072 ("Extrinsic analysis is objective in
nature.  It depends not on the responses of the trier of fact, but
on specific criteria which can be listed and analyzed.") (internal
quotation marks and alteration omitted); <u>Berkic v. Crichton</u>, 761
F.2d 1289, 1292 (9th Cir. 1985).  Courts can, and do, analyze these
objective elements at the motion to dismiss stage.  <u>See</u> <u>Silas</u> 201
F. Supp. 3d at 1172 (C.D. Cal. 2016); <u>Advanta-STAR Auto. Rsch.
Corp. of Am. v. Search Optics, LLC</u>, 672 F. Supp. 3d 1035, 1047
(S.D. Cal. 2023); <u>Kevin Barry Fine Art Assocs. v. Ken Gangbar
Studio, Inc.</u>, 391 F. Supp. 3d 959, 966 (N.D. Cal. 2019); <u>Erickson
v. Blake</u>, 839 F. Supp. 2d 1132, 1136 (D. Or. 2012); <u>Capcom Co. v.
MKR Grp., Inc.</u>, No. C 08-0904 RS, 2008 WL 4661479, at *5 (N.D. Cal.
Oct. 20, 2008).

    B.  Extrinsic analysis

    In conducting extrinsic analyses of specific objective
elements, courts must remain mindful that not "every element of the
work may be protected.  Originality remains the sine qua non of
copyright; accordingly, copyright protection may extend only to
those components of a work that are original to the author."

Feist, 499 U.S. at 111.  Thus, courts "must take care to inquire only whether the protectible elements, standing alone, are substantially similar," and "filter out and disregard the non-protectible elements." Cavalier, 297 F.3d at 822 (cleaned up). For example, "[f]amiliar stock scenes and themes that are staples of literature are not protected." Id. "Scenes-a-faire, or situations and incidents that flow necessarily or naturally from a basic plot premise," are similarly unprotected.  Id.; see also Satava v. Lowry, 323 F.3d 805, 810 (9th Cir. 2003) ("[E]xpressions that are standard, stock, or common to a particular subject matter or medium are not protectable under copyright law."); see also Swirsky v. Carey, 376 F.3d 841, 850 (9th Cir. 2004) ("[W]hen certain commonplace expressions are indispensable and naturally associated with the treatment of a given idea, those expressions are . . . not protected by copyright."). With this in mind, the court turns to the "articulable similarities between the plot, themes, dialogue, mood, setting, pace, characters, and sequence of events in two works."[2]  Cavalier 297 F.3d at 822.

---

[2] Defendants have not filed a separate Request for Judicial Notice, but have lodged the Movie and seasons 1 and 2 of Yellowjackets as exhibits to the instant Motion to Dismiss.  These materials are incorporated into the Complaint by reference.  See Fillmore v. Blumhouse Prods., LLC, No. 2:16-CV-04348-AB-SS, 2017 WL 4708018, at *2 (C.D. Cal. July 7, 2017), aff'd, 771 F. App'x 756 (9th Cir. 2019).  Defendants also appear to suggest that the court take judicial notice of certain historical facts, such as the 1972 crash of Uruguayan Air Force Flight 571 in the Andes mountains and subsequent travails of a rugby team traveling on board, as well as certain other works of fiction, such as, but not limited to, the 1993 film "Alive," which dramatized the tale of the Andes crash survivors, and the 1954 novel "Lord of the Flies."  Beyond intimating that these requests would be more appropriate at the summary judgment stage than at the pleading stage, Plaintiff does not appear to oppose consideration of these and other works, and indeed, also makes reference to other fictional works.  Moreover,
(continued...)

1.   Plot

At the outset, the court notes that a comparison of the two
works at issue here is complicated somewhat by their differing
formats.  While the movie runs approximately 90 minutes, the two
seasons of Yellowjackets presently before the court span roughly
nineteen hours, spread over an equal number of episodes.  This
fundamental difference cuts both ways, allowing Defendants to
emphasize differences from the Movie that play out over time, while
also creating the potential for Plaintiff to amalgamate elements
from moments scattered across numerous episodes in an attempt to
manufacture similarities.  See Gable v. Nat'l Broad. Co., 438 F.
App'x 587, 589 (9th Cir. 2011) (unpublished disposition)
(minimizing "superficial points of comparison" between screenplay
and television series, "gleaned haphazardly from three seasons of"
the latter.)

a.   The Movie

The Movie begins with the United States men's national soccer
team winning the World Cup.  Their flight home crashes into the
ocean near a remote Pacific island.  Roughly a dozen team members
survive, along with a trainer and the head coach's two adult
daughters.  Team captain Slim is reluctant to lead the group of
survivors, and falls ill.  Another teammate, Andreas, gradually
takes on a position of authority, convincing a majority of the
survivors, including Slim, to withhold food and water from injured
survivors in an attempt to conserve the group's dwindling supplies.

---

[2](...continued)
courts in this district have often "taken judicial notice of
elements that are common to a given genre."  Silas, 201 F.Supp.3d
at 1170 (collecting cases).

Two teammates decide to surreptitiously appropriate the party's lone life raft, and flee the island.  The team trainer, despondent over the group's descent into selfish survivalism, commits suicide by jumping off a cliff into the sea.  When Andreas' brother is injured by a World War Two-era landmine, Andreas insists that the group continue to withhold succor from the injured, and suffocates his brother to spare him further suffering.  The situation comes to a head after a week, when the survivors discover that one of their number has been stealing food.  Andreas flies into a murderous rage, and another teammate is killed trying to prevent bloodshed.  The survivors split into two factions, with Andreas' group moving to an outlying island and Slim leading the remaining castaways.  When Andreas' faction fails to find sustenance, he returns to the main island to steal from Slim's group.  Soon after, roughly two weeks after the initial crash, Andreas' faction returns to the main island to attack Slim's contingent.  Several survivors are killed, and members of Andreas' group begin to regret their actions and defect.  As Slim and Andreas fight on the beach, a rescue helicopter arrives.  Andreas slips away into the jungle, and the remaining castaways tell their rescuers that there are no other survivors.

      b. Yellowjackets

 Yellowjackets takes place in two different time periods.  In the 1990s, a high school girls' soccer team is en route to a match when their airplane crashes in a dense Canadian forest.  Several girls, the head coach's two teenage sons, and one adult assistant coach survive.  An unpopular team manager (Misty) helps render first aid and, reveling in her newfound importance, destroys the

plane's emergency beacon.  The survivors find a small airplane and an abandoned cabin stocked with supplies.  The girls gradually begin to believe in the supernatural powers of the wilderness, and one of them (Lottie) begins to have mysterious prescient visions. When a group of girls attempts to hike out of the woods, they are attacked by wolves and forced to return to the cabin.  Soon after, a devout girl attempts to fly the abandoned plane, but it explodes soon after takeoff.  The girls throw a hallucinogenic-fueled bacchanal, and nearly murder one of the boys (Travis), and his younger brother flees and disappears.  The girls, led by Lottie, continue to adopt increasingly witchcraft-like practices.  One formerly popular member of the group, Jackie, is forced to sleep outside, where she freezes to death.  Jackie's best friend, Shauna, who is pregnant by Jackie's boyfriend, talks to Jackie's frozen corpse, begins to hallucinate that Jackie is still alive, and secretly starts to eat parts of Jackie's body.  Eventually, the young people all eat Jackie's body, while the horrified assistant coach looks on.  Other girls, including Taissa, begin having mystical experiences and visions of their own, and the witchy activities escalate.  One girl accidentally falls off of a cliff and dies when threatened by Misty.  Shauna gives birth to a stillborn baby, but has hallucinations of the other survivors eating it, and attacks Lottie.  The girls' visions intensify, and Travis' younger brother is found hiding nearby.  The girls draw cards to see who will be killed for food, but the loser (Natalie) flees.  The girls watch as the younger brother drowns trying to help her, and consider him a substitute for Natalie.  The girls and Travis ritualistically eat the younger brother's body, and Lottie,

9

who has new misgivings about the girls' actions, anoints Natalie as the new witchy leader.  The cabin then burns down, likely at the hands of the assistant coach, who is increasingly disturbed by the teenagers' behavior.

Interspersed with the 1990s story are scenes involving some of the same characters, but in the present day.  Shauna is married to Jeff, Jackie's former boyfriend and the father of Shauna's stillborn baby and teenage daughter.  Natalie struggles with drug addiction, while Taissa is an ambitious politician and Misty has become a sociopathic nurse.  The women refuse to talk to outsiders about their experiences in the wilderness, but receive cards depicting a symbol associated with their witchy activities in the woods.  Misty and Natalie track down Travis, but find him dead by hanging.  Natalie believes he was murdered, and discovers evidence of a witchy ritual.  Shauna begins having an affair, which is discovered by her daughter.  Taissa's son begins to have disturbing visions, which are revealed to be Taissa herself, as she sleepwalks or has multiple personalities.  The women discover that the mysterious cards are from Jeff, who is trying to blackmail them to pay off a debt.  Shauna discovers that her lover is trying to uncover her past, and kills him, confiding in Jeff.  Misty kidnaps, then kills, a private investigator.  As Taissa wins an election, her wife discovers a ghastly, witchy altar underneath the family home, apparently constructed by Taissa's alter ego.  Natalie discovers that Lottie accessed Travis' bank accounts before he died, but she is then kidnapped by members of a cult led by Lottie. Misty tries to find Natalie, eventually teaming up with an idiosyncratic new friend.  Shauna and Jeff cover up her crime, but

their daughter finds out their secret, and others' suspicions of Shauna grow.  Natalie and Taissa start to have visions and hallucinations.  Lottie tries to help Natalie at the cult's compound, and claims that she had tried to help Travis process his trauma from the woods.  Taissa tries to deal with her alter ego and tracks down her estranged former girlfriend from the soccer team. The women all eventually convene at Lottie's compound and confess their secrets to each other.  An increasingly unhinged Lottie insists they perform another witchy ritual sacrifice, and the women again draw cards, like they did in the cabin.  Chaos ensues, and Natalie is killed by Misty's hand, sacrificing herself to protect someone else and satisfying Lottie, who has been shot by Shauna's daughter.

### c.    Comparison

Even a brief perusal of the above summaries makes clear that, as Plaintiff itself acknowledges, the present-day timeline in Yellowjackets bears little resemblance to the plot of the Movie. Plaintiff maintains, however, that "the entire [1990s] 'survival' timeline is copied from Eden."  (Opposition at 11:4.)  Although Plaintiff points to several specific plot points in support of this contention, this argument is not persuasive.

First, Plaintiff mischaracterizes certain events in both works.  For example, Plaintiff contends that the Movie "alludes to cannibalism."  The conversations highlighted by Plaintiff, however, do no such thing, and instead focus on the characters' debate over whether to withhold food from injured survivors.  Indeed, the entire Movie takes place over the course of only two weeks, and

Slim's faction is able to successfully gather food without ever considering, let alone resorting to, cannibalism.

Similarly, Plaintiff likens the assistant coach's revulsion in Yellowjackets, which culminates with him burning down the cabin and fleeing to a cave, as similar to the trainer's suicide in the Movie, both of which Plaintiff characterizes as "escapes."  (Opp. at 12:10.)  While this term could perhaps apply to both events on some abstract philosophical level, and even putting aside the issue whether such metaphysical questions invoke some common literary trope, these two instances bear little resemblance to each other as plot points,[3] as the Yellowjackets coach's active attempt to interfere with the girls' activities, which occurs as a cliffhanger at the end of season two, is the antithesis of the Movie trainer's desperate, mid-story effort to avoid confronting his own potential, and his fellow survivors' increasing, selfishness and savagery.

Nor, contrary to Plaintiff's contention, does Yellowjackets include a suicide.[4]  Although one Yellowjackets character, like the Movie trainer, does die by falling off a cliff, her death is accidental, and occurs largely because of Misty's threatening acts rather than of the decedent's own volition.  Lastly, the discovery

---

[3] "'Plot' is defined at the sequence of events by which the author expresses his theme or idea that is sufficiently concrete to warrant a finding of substantial similarity if it is common in both works."  Kahn v. CJ E & M Am., Inc., No. CV 21-3230-DMG (KSX), 2022 WL 2037409, at *6 (C.D. Cal. Mar. 28, 2022) (quoting Zella, 529 F. Supp. 2d at 1135) (emphasis added).

[4] Plaintiff does not contend that Travis' hanging in the present day timeline is similar to the trainer's suicide in the Movie, and indeed, Travis' death by hanging is later revealed to have been accidental.  Nor does Plaintiff point to the assistant coach's contemplation of, but ultimate decision not to commit, suicide in the 1990s timeline.

of evidence of prior inhabitants in both works is not "strikingly similar," as Plaintiff claims. (Opp. at 15.) In Yellowjackets, the survivors find, and all take shelter in, a well-stocked cabin and make use of a functional airplane. In the Movie, survivors encounter a small World War Two-era bunker containing the skeleton of a lone soldier, surrounded by land mines. None of these supposed parallels evinces substantial similarity of the two works.

Second, most of the remaining similarities are common scenes-a-faire. Specifically, Plaintiff points to (1) the death of a head coach and survival of his two children, (2) attempts by survivors to escape isolation and contact rescuers, and (3) a division of survivor groups into rival factions. (Opp. at 11-12.) Of these, the first is, at least in part, sufficiently original to be protectable. Other than an inversion of genders, both works involve a surviving pair of teenage or young adult siblings who are children of the deceased head coach, and in both works, at least one of the siblings forms a romantic relationship with another survivor.

This similarity alone, however, is insufficient to sustain an infringement claim. "[E]ven where the fact of copying is conceded, no legal consequences will follow from that fact unless the copying is substantial." Newton v. Diamond, 388 F.3d 1189, 1193 (9th Cir. 2004); see also Skidmore, 952 F.3d at 1064. ("[T]he hallmark of 'unlawful appropriation' is that the works share *substantial* similarities."). There can be no serious dispute that escape attempts by shipwrecked or stranded survivors are prevalent throughout fiction and history, from Odysseus, Robinson Crusoe, and

Gilligan to Shackleton and the Uruguayan rugby team.[5]  Instances of competition, tribalism, and factionalism in disaster scenarios or in response to resource scarcity are nearly as commonplace, from "The Tempest" to "Survivor" to much of the post-apocalyptic genre, such as the "Mad Max" films or any of a number of zombie stories, to, most archetypically, "Lord of the Flies."  Because "[s]uch expressions [are] indispensable and naturally associated with the treatment of a given idea," they are not protected by copyright.  Rice v. Fox Broad. Co., 330 F.3d 1170, 1175 (9th Cir. 2003), overruled on other grounds by Skidmore, 952 F.3d 1051.

    2.   Mood and Theme

Defendants assert that the Movie is a "straight-forward thriller" with a "somber and brooding" mood that differs from the "darkly comedic" tone of Yellowjackets.  (Mot. at 18.)  Plaintiff's opposition, without identifying any defining mood in either work, attributes any differences primarily to the works' respective lengths, which afford differing opportunities for character development.[6]  (Opp. at 16.)  Even accepting Defendants' characterizations, "somber and brooding" and "darkly comedic" moods

---

[5] The escape attempts in the works at issue here also differ in their nature and result.  In the Movie, the two teammates who steal the raft successfully contact rescuers, who then reach the remaining survivors.  In Yellowjackets, the escape attempt by plane fails when the plane explodes, killing the young survivor-pilot, and the overland attempt fails when wolves attack and maim the would-be escapees.

[6] Plaintiff's Complaint does identify other elements of mood, but in broad terms that are not supported by examples in the Complaint or Plaintiff's opposition.  For example, the Complaint asserts that both works are humorous, with "moments of dark humor and witty dialogue."  Plaintiff has provided no example of any such moment in the Movie, and the court would be hard-pressed to identify one.

are not mutually exclusive, and Yellowjackets reflects both.
Indeed, it is difficult to imagine how any serious drama involving
a descent into ritualized cannibalism, and its aftereffects, could
possibly exclude elements of solemnity and brooding contemplation.
This observation, however, highlights the more fundamental problem
with Plaintiff's position: brooding introspection related to, as
Defendants put it, humans' brutish survival instinct "flows
naturally from unprotectable basic plot premises" in the context of
survival stories, and is therefore also not protectable. Shame on
You Prods., Inc. v. Elizabeth Banks, 120 F. Supp. 3d 1123, 1158
(C.D. Cal. 2015), aff'd sub nom. Shame on You Prods., Inc. v.
Banks, 690 F. Appx 519 (9th Cir. 2017) (quoting Rice, 330 F.3d 1170
at 1175 (9th Cir. 2003); see also Zella, 529 F. Supp. 2d at 1136
(finding upbeat mood a scene-a-faire in the context of a cooking
show, because "it is difficult to imagine a somber show of this
nature.").

    The same is true of the works' themes. Although both works
include an examination of the darkness and potential for violence
within all people, such themes are common tropes in the survival
genre. Moreover, as Defendants highlight, and Plaintiffs do not
address, Yellowjackets also focuses on other themes, such as the
nature of female friendships at various stages of life and the
particular challenges of mid-adulthood, especially in relation to
past trauma. The protectable elements of the works' mood and
themes are not, therefore, substantially similar.

        3.   Characters

    Plaintiff's Complaint lists several characters in each work,
along with their allegedly similar attributes. (Compl. ¶¶ 25-26.)

These descriptions, however, are either general, inaccurate, or both.  Both Jackie and Slim, for example, are described as "talented soccer player[s]" who are also team captains.  As an initial matter, virtually every soccer team has a team captain, and presumably selects one of the more talented players to be captain.  Beyond that high-level similarity, it is difficult to see what Slim, an adult, male, Black, elite international athlete who serves as a moral authority and selfless leader to a band of survivors, has in common with Jackie, a teenage, white, whiny, self-absorbed girl who, though formerly popular, is excluded, and eventually eaten, by her peers.

Although Plaintiff describes both Yellowjackets assistant coach Ben and Movie head coach Defoe [sic] as "providing guidance and support to the survivors," the former is largely sidelined as a result of a grievous injury and fundamentally opposed to the girls' actions, while the latter does not even survive the initial plane crash.  The Complaint describes both Misty and the trainer in the Movie as "nurse-like," apparently because both render first aid to some extent, without any acknowledgment that Misty, an unpopular, sociopathic white teenage girl, threatens multiple people, is responsible for a teammate's death, and actively works to prevent fellow survivors' rescue, while the trainer in the Movie, an empathetic adult Asian man, grows so despondent at the thought of depriving fellow survivors of aid that he kills himself to avoid having to face that moral dilemma.

Lastly, although Plaintiff describes both Lottie and Andreas as a "mysterious, complex, and troubled character who struggles with demons," these descriptors are true, if at all, at only a high

16

1   level.  Although there is little explanation for Andreas'

2   increasing savageness, neither is there any mystery to his

3   character, and his only "demons" are the figurative ones presumably

4   underpinning anyone's violent acts.  Lottie, in contrast, has

5   prescient visions and power over nature (including a grizzly bear

6   that submissively approaches Lottie and allows her to kill it with

7   a knife), develops and encourages dark ritual practices, including

8   human sacrifice and cannibalism, and is eventually committed to a

9   psychiatric facility.  Contrary to Plaintiff's argument, these

10  differences between character pairs are not simply a matter of the

11  Movie's characters being "less defined" than their supposed

12  Yellowjackets counterparts as a result of the Movie's insufficient

13  "time to devote to character development."  The characters, rather,

14  are fundamentally different.

15          4.   Setting and Pace

16   As is evident from the above discussion, the setting and pace

17  of the two works differ greatly, as neither New Jersey nor the

18  boreal Canadian wilderness bear any resemblance to an uninhabitable

19  tropical island.  Moreover, the "desolate area" setting highlighted

20  by Plaintiff is a common element of survival stories, including

21  historical events such as the travails of the Uruguayan rugby team

22  in the Andes or the Donner Party in the Sierra Nevada.  As for

23  pacing, Plaintiff glosses over the fact that Yellowjackets takes

24  place in two distinct timelines separated by at least twenty years.

25  Although Plaintiff attempts to focus only on Yellowjackets' 1990s

26  "survival timeline," even that story unfolds over the course of

27  nearly two years, while also including flashbacks to pre-crash

28  events.  The Movie, in contrast, is told, with one exception,

1  completely linearly, and takes place entirely over the course of
2  only two weeks.[7]  The supposed balance of "slower, character-driven
3  moments with more intense, plot-driven sequences" (Compl. ¶ 30)
4  allegedly present in both works is a generic element not only of
5  the survival genre, but of nearly every work of fiction, and is not
6  protectable.  There is no substantial similarity of any protectable
7  element of the works' setting or pace.

8  **IV.  Conclusion**

9      For the reasons stated above, Plaintiff has failed to
10 adequately allege that the works at issue here are substantially
11 similar.  Accordingly, Defendants' Motion to Dismiss is GRANTED.
12 Although the court would typically grant a plaintiff leave to amend
13 a dismissed original complaint, the deficiencies in Plaintiff's
14 copyright claim here are not an artifact of any pleading
15 deficiency, but rather stem from the fundamental characteristics of
16 the works themselves.  Any amendment would, therefore, be futile.
17 Accordingly, Plaintiff's Complaint is DISMISSED, with prejudice.
18 See Rentmeester, 883 F.3d at 1125.

19     IT IS SO ORDERED.
20 Dated: April 25, 2025

22                          DEAN D. PREGERSON
                          United States District Judge

---

27     [7] The early moments of the Movie include a few seconds of Slim
28 running through the jungle, before then jumping backward in time
   and proceeding linearly.

18