# EXHIBIT 3

1                  UNITED STATES DISTRICT COURT

2                  CENTRAL DISTRICT OF CALIFORNIA

3                       WESTERN DIVISION

4                          - - -

5        HONORABLE DEAN D. PREGERSON, DISTRICT JUDGE PRESIDING

6

7     EDEN FILM PRODUCTION, LLC,        )
                                        )
8              Plaintiffs,              )
                                        )
9                                       )
                                        )
10            vs.                       ) No. CV 24-09851-DDP
                                        )
11                                      )
                                        )
12    LOCKJAW, LLC, et al.,             )
                                        )
13            Defendants.               )
      _____ )

14

15

16            REPORTER'S TRANSCRIPT OF PROCEEDINGS

       *MOTION TO DISMISS PLAINTIFF'S COMPLAINT HEARING [37]*
17

18                 LOS ANGELES, CALIFORNIA

19                 MONDAY, APRIL 21, 2025

20    _____

21                    MARIA R. BUSTILLOS
                    OFFICIAL COURT REPORTER
22                      C.S.R. 12254
                  UNITED STATES COURTHOUSE
23                   350 WEST 1ST STREET
                       SUITE 4455
24            LOS ANGELES, CALIFORNIA 90012
                     (213) 894-2739
25

1                        **A P P E A R A N C E S**

2

3

4       **ON BEHALF OF THE PLAINTIFFS,**
        **EDEN FILM PRODUCTION, LLC:**        THOMPSOM STAM, PLLC
5                                             BY:  CHARLES M. STAM, ESQ.
                                              717 TEXAS AVENUE
6                                             SUITE 1200
                                              HOUSTON, TX 77002
7                                             (844)846-7826

8

9       **ON BEHALF OF THE DEFENDANTS,**
        **LOCKJAW, LLC:**                     DAVIS WRIGHT TREMAINE, LLP
10                                            BY:  CYDNEY S. FREEMAN, ESQ.
                                              350 SOUTH GRAND AVENUE
11                                            TWENTY-SEVENTH FLOOR
                                              LOS ANGELES, CA 90071
12                                            (213)633-6800

13
                                              DAVIS WRIGHT TREMAINE, LLP
14                                            BY:  NICOLAS A. JAMPOL, ESQ.
                                              350 SOUTH GRAND AVENUE
15                                            TWENTY-SEVENTH FLOOR
                                              LOS ANGELES, CA 90071
16                                            (213)633-6800

17

18

19

20

21

22

23

24

25

1      **<u>I N D E X</u>**

2

3                                                                        <u>PAGE</u>

4      MOTION TO DISMISS PLAINTIFF'S COMPLAINT HEARING [37]:      4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1              LOS ANGELES, CALIFORNIA; MONDAY, APRIL 21, 2025

2                            -o0o-

3            (COURT IN SESSION AT TIME ^ A.M. ^ P.M.)

4            THE COURTROOM DEPUTY:  Item one,

5     CV 24-09851-DDP: *Eden Film Production, LLC v. Lockjaw,*

6     *LLC.*

7            Counsel, please state your appearances.

8            MS. FREEMAN:  Good morning, Your Honor.

9     Cydney Swaford Freeman and Nicolas Jampol for the

10    defendants.

11           THE COURT:  Good morning.

12           MR. STAM:  Good morning, Your Honor.

13    Charles Stam for plaintiff.

14           THE COURT:  Okay.  Go ahead, Mr. Stam.

15           MR. STAM:  Well, I don't think it's my motion,

16    Your Honor.

17           THE COURT:  It's not your motion.  Maybe I've

18    got the parties mixed up.

19           You represent?

20           MR. STAM:  The plaintiff.

21           THE COURT:  Oh, I see.  Yes, I got you.  Fair

22    enough.  Go ahead.

23           MS. FREEMAN:  Thank you, Your Honor.

24    Your Honor, courts in this district routinely dismiss

25    cases like this:  Copyright cases for lack of

```
 1    substantial similarity at the pleading stage.  They have
 2    the works in front of them.  They're absolutely able to
 3    and they do review the works at issue.  And when the
 4    works at issue aren't similar enough to justify a claim
 5    of copyright infringement, they dismiss the case.  And
 6    we respectfully argue that that's exactly what should
 7    happen here.  First of all, the similarities that
 8    plaintiff alleges, the work share, they're all
 9    unprotectible.  They're common not only to the survival
10    genre.  There's a -- a crash landing.  People look for
11    resources.  There are hardships.  There are some more
12    uplifting moments and ultimately, people are saved, but
13    they're also actually -- also rooted in a real life
14    situation, real facts that happened with the Uruguayan
15    rugby team who crash-landed in the Andes mountains and
16    had to survive for 70 days on their own.  So it's not
17    only just scène à faire common tropes.  It's rooted in
18    real life and real fact that neither the plaintiff nor
19    the defendants nor anyone else can own in this
20    situation.
21             THE COURT:  Well, it goes way before the Andes
22    crash with the soccer team.  I mean, the Donner party,
23    you could go -- you could go way back.  So there's a lot
24    more than that.
25             MS. FREEMAN:  We would respectfully agree with
```

1    that.

2            THE COURT:  Well, it's just fact.

3            MS. FREEMAN:  Exactly, Your Honor.  And even if

4    we set aside all of those scène à faire, those facts,

5    those common expressions, when you look at the

6    particular expression in each of these works,

7    plaintiffs' film and our client's television series,

8    they're very very different.  The plaintiffs film is a

9    pretty straightforward somber survival thriller.  The

10   U.S. men's soccer team crash-lands on a deserted island.

11   They don't have a source of fresh water.  They don't

12   seem to have a source of food though.  That's not

13   exactly delved into in the film.  They spend two weeks

14   trapped in that island.

15           THE COURT:  Well, they went into the airplane

16   and pulled up some, you know, snacks.

17           MS. FREEMAN:  Yes, Your Honor.  And there's

18   some discussion about whether they can hunt game on the

19   island or not.  And I don't think that's resolved.  The

20   water really seems to be the crux of the issue in Eden.

21   So they don't have water.  They're trying to figure out

22   a way to do it.  And very Lord of the Flies style, they

23   faction off into two separate groups.  There's the

24   compassionate group who's trying to save their friends,

25   who's donating their rations to their friends who have

 1    been injured.  And then there's the ruthless group that

 2    reverts to this more animalistic style, and they are

 3    looking to steal rations from the other group.  And it

 4    culminates in a big fight where the leaders are battling

 5    out.  They've set fire to the compassionate group's

 6    camp, and then helicopters descend because two of the

 7    soccer team players had managed to escape.  And they

 8    found help.

 9            THE COURT:  I thought just one helicopter.  Was

10    there more than one?

11            MS. FREEMAN:  I thought there were two because

12    there were quite a few of them, but maybe it was just

13    one, Your Honor.

14            THE COURT:  Okay.  Okay.

15            MS. FREEMAN:  But they're rescued by

16    helicopter.  That's the end of the movie.  We don't know

17    anything about the characters' backgrounds.  We don't

18    know anything about the characters' futures.  It's very

19    contained.  It's a two-week period that we're following.

20    And then on the other hand, Your Honor, we have

21    *Yellowjackets*, which is a multi-season television

22    series; but from the very start, it's important.  It is

23    focused on two different timelines.  There is a survival

24    timeline where a high school girl's soccer team

25    crash-lands in the Canadian Rockies on their way to a

1    tournament.  They immediately find fresh water.  They

2    find shelter.  They start to build a life there.  And

3    they're stuck for more than a year there.  So when times

4    get hard, it's when they run out of game.  It's in the

5    winter.  There aren't many animals around.  And all of a

6    sudden, what do they do?  They ban together, and they

7    decide that they're going to have to eat, first their

8    dead colleagues but then themselves.  Now, in Eden, the

9    complaint says that there's cannibalism.  There is no

10   cannibalism.  *Yellowjackets* this is a pretty prominent

11   theme.  They hunt each other by agreement.  They all

12   draw cards.  Whoever draws the queen of hearts is the

13   sacrificial lamb.  They hunt each other.  They kill each

14   other.  They cook each other, and they eat each other.

15   Not to spoil anything for anyone who hasn't seen it, but

16   that's at the heart of *Yellowjackets*.  And then what

17   that turns into is that second plot line where we come

18   to the current day -- time, and there are a few

19   survivors.  They're banded together once again because

20   someone seems to be out to get them.  Someone knows

21   about what they did to each other in the past and seems

22   to be picking them off one by one.  We don't know who.

23   We don't know how.  But that's the question:  It's how

24   does your adult-self face what you have done previously

25   in your life?  How do you overcome that?  It's entirely

1    different.  And so we respectfully request, Your Honor,

2    that this is an appropriate case for dismissal on the

3    pleadings with prejudice.

4         THE COURT:  All right.  Thank you.

5         MR. STAM:  May it please the Court...

6         Counsel's arguments are well-taken.  There are

7    differences between the two works, many of them lending

8    themselves to a three-season television arc with, you

9    know, 10-hour long episodes versus a one 2-hour long

10   movie.  I would submit, though Your Honor, that the

11   arrangement in the scenes of the team going down and

12   turning on each other, turning into sort of -- engaging

13   in cult-like behavior following a charismatic leader and

14   repeating, you know, the norms of society.  While it is

15   similar to the *Lord of the Flies*, I buy all that, I

16   would submit that they go too far in claiming that these

17   are scène à faire.  You know, there's a scene -- there's

18   a possibility where the teammates work together, like

19   they did in the Andes.  There have been several movies

20   where, you know, there was a remake in *93 Alive*; but

21   then there was an Italian movie that came out a couple

22   years ago, I believe, based on the Andes plane crash,

23   and that movie is about people finding resilience

24   together, you know, reaffirming their bonds, finding

25   Catholic faith in the case of the Italian movie.  So the

1    motion that there is always going to be some sort of

2    brutal cult-like charismatic leader emerging and

3    undermining the bases of society, the bonds of teamwork,

4    the sort of things that are taken to be a given, you

5    know, in the civilized world, I don't think that's a

6    scène à faire.  You know, there could be a situation

7    where, you know, there ws a movie called, *Triangle of*

8    *Sadness*, where the staff turned on the rich people.

9              THE COURT:  You think it's a -- unique that a

10   group of people turns to a -- a charismatic evil leader?

11             MR. STAM:  Not necessarily, but the selection

12   of the arrangement here make it substantially --

13             THE COURT:  In what way?

14             MR. STAM:  Well, I think that it is not as

15   though being in the jungle or being in the wilderness or

16   being marooned somewhere necessarily lends it itself to

17   that.  You could find a tribe and conflict with the

18   tribe.  You could join an indigenous society.  You could

19   learn something in the wilderness that reaffirms life in

20   civilization, things that involve crashes and things

21   that involve, you know, survival don't necessarily

22   involve intergroup conflict.  You know, it can involve,

23   you know, finding of inner strength.  So I do agree that

24   this is something that, you know --

25             THE COURT:  So either possibility is out there;

 1  right?  You know that just from I think just our -- our

 2  interactions with history and the world and everything

 3  else?

 4        MR. STAM:  I accept that, Your Honor.  But I

 5  would also say, you know, there is -- you know, the --

 6  you know, if we look at the common-law story of that

 7  boat where the people have to eat one of their fellow

 8  member -- you know, one of the fellow crew mates because

 9  there are no further options besides eating.  That is

10  sort of a moral dilemma.  You know, at what point do we

11  have to do things that we ordinarily would not wish to

12  do in civilized society.  There's a difference between

13  that and leaning into the idea of the savagery and

14  leaning into the idea of shackling off all social

15  conventions.  And I think that's sort of a unique twist

16  on that thought.

17        THE COURT:  Okay.  Again, that's pretty high

18  level in terms of seeking, you know, some scintilla of

19  creativity or distinction that would -- that is required

20  for there to be substantial similarity.

21        MR. STAM:  Well, I think -- sorry, sorry.

22        THE COURT:  Go ahead.  Sorry.

23        MR. STAM:  Some of the similarity comes in mere

24  inversion.  You know, I would say that there is

25  authority to show that if you take an element, like, if

```
 1    I had a team about, you know, the boys' soccer team from
 2    Canada crashing in Washington, even though those are
 3    inversions, they are still in the sense, substantially
 4    similar when you consider plot themes --
 5         THE COURT:  You think your client owns the
 6    concept of airplane crashes or boat gets marooned and
 7    people turn into, you know, their lesser selves?
 8         MR. STAM:  Absolutely, not.  I would say that
 9    it owns the concept of the team interaction -- when we
10    have people who are thrown together, like if I was on a
11    commercial flight, for example, and then I meet a bunch
12    of random people because the plane crashes, that is
13    different than having people, who are supposedly your
14    teammates, your brothers, or sisters or aunts.
15         THE COURT:  So you own the -- you own the idea
16    then of people that have some common thread, whatever it
17    might be; and then they're faced with this -- you know,
18    this breakdown of civilization.  And that's sort of the
19    unique part of it; right?
20         MR. STAM:  I suppose so, Your Honor; but
21    respectfully, I would cabin it even further.  I think
22    the way you stated it, was still a little bit too
23    general.  I would say it's in the context of a
24    specific -- you know, of teammates being put together
25    and then having a break from society that ruptures, you
```

1    know, those bonds.  I do think that that is, you know --

2    again, it's a close call.  Counsel here are extremely

3    proficient and make great arguments, but I think that on

4    the motion to dismiss stage, given that, you know,

5    Judge Wardlaw has said that, you know, substantial

6    similarity on the extrinsic test is disfavored even at

7    summary judgment, I would just submit that we're able to

8    get over the line, but I think that their arguments are

9    well-taken, sir.

10            THE COURT:  Okay.  Fair enough.  Thank you.

11            MR. STAM:  Thank you.

12            THE COURT:  Anything further?

13            MR. STAM:  And I don't -- you know, Your Honor,

14    there are some -- you know, I would say that there --

15    you know, I don't want to rehash the facts and all of

16    these similarities.  You know, recently, you know, I was

17    just informed that Connie, you know, who's our character

18    in Eden, commit suicide.  The trainer, Ben, is

19    essentially euthanized because they ask him, you know,

20    that -- they say, oh, can you please, you know, take

21    us -- take me out of my misery.  I didn't see the third

22    season of *Yellowjackets* to be fair, but I would just say

23    that if we get into the granularity of what the

24    characters do, what their roles are, and, you know,

25    they're either, I would submit, substantial similarities

```
 1    or inversions that, you know, might serve to a light of

 2    substantial similarity, but when placed in the context

 3    of plot, theme, and sequence --

 4              THE COURT:  That's too fast for the court

 5    reporter.

 6              MR. STAM:  Well taken.

 7              THE COURT:  Sorry.

 8              MR. STAM:  I was just trying to finish, and I

 9    was --

10              THE COURT:  Yeah, right.

11              MR. STAM:  I think that when you put them in

12    that context, Your Honor, then we get over the hump,

13    because when you -- if we were to go look back at the

14    plot and how the different characters function, it's

15    just driving the action.

16              THE COURT:  Is it attrit at some point if

17    there's ten seasons of Yellowjackets?

18              THE WITNESS:  Attrit you said, I'm sorry?

19              THE COURT:  Attrit.  You know, attrition?

20    'It's --

21              MR. STAM:  Oh, certainly.

22              THE COURT:  -- it diminishes.

23              MR. STAM:  I mean, in season one of

24    Yellowjackets, there was no cannibalism.  It was hinted

25    at, I believe.  I think that it was implied, but I don't
```

```
 1    think --
 2            THE COURT:  You have to slow down.  Sorry.  You
 3    know, there's no rush.  It's just the Court reporter
 4    cannot keep up.  So...
 5            MR. STAM:  In Yellojackets season one --
 6            THE COURT:  Yes?
 7            MR. STAM:  -- I'm happy to be corrected, if I'm
 8    wrong -- but my understanding is, although, the theme of
 9    cannibalism is alluded to, is hinted at, it doesn't
10    occur until season two.  That's from my recollection
11    when the cannibalism occurs.  It's hinted at.  So I
12    would say, Your Honor, that if we cut off Yellowjackets
13    at season one, it would help -- you know, it would
14    really nest itself much better, but certainly,
15    Your Honor, with season two and with season three, the
16    elements that co-counsel, you know, referenced become
17    more prominent.
18            THE COURT:  Okay.  Very well.  Thank you.
19            MR. STAM:  And my apologies for speaking so
20    quickly.
21            THE COURT:  You're fine.
22            MS. FREEMAN:  Thank you, Your Honor.  Just a
23    few points in rebuttal.
24            First of all, I think it's interesting that
25    we're talking about now potentially --
```

```
 1              THE COURT:  Yes, please, slow down too.

 2              MS. FREEMAN:  Yes, sir.

 3              THE COURT:  Thank you.

 4              MS. FREEMAN:  I think it's interesting now that

 5     we're talking about cutting off the complaint at season

 6     one, because even during argument we're now bringing in

 7     elements from season three as examples of how it's

 8     similar.  And I actually wanted to raise about

 9     Coach Ben.  We're talking about season three, if we're

10     going to talk about it.  Coach Ben has refused to

11     participate in the cannibalism all along.  The

12     Yellowjackets -- the Yellowjackets' team has decided to

13     sentence him to death because they wrongly think that he

14     burned down their means of survival and their habitat.

15     And he's euthanized because he is so weak, so starved

16     that he cannot physically maintain himself.  And he's

17     euthanized by the team's leader right before he's set to

18     be murdered.  So this is not a similar situation to

19     Connie, and it's an excellent example of how we can pull

20     out these similarities at a very high and abstract

21     level; but when we look at what actually happens,

22     they're very different.

23              Second of all, we were discussing scène à faire

24     and how maybe it's possible in this work that they took

25     one path about rivaL factions, which, again, is not what
```

1    happens in Yellowjackets, but even assuming the

2    allegations are true, this rival path, the scène à

3    faire doesn't have to be the only way you can express

4    something.  It looks at whether this is common.  This is

5    *Lord of the Flies*.  This is many other works as

6    Your Honor mentioned earlier.  This is not a unique way

7    to structure a survival genre at all.

8         And third of all, some of the language used was

9    that this is a close call that gets over the hump.  And,

10   Your Honor, I would respectfully say that this is not a

11   close call, especially in this particular situation.

12   And I believe plaintiff's counsel mentioned

13   Judge Wardlaw's opinion, which I would say, first of

14   all, judge Wardlaw's opinion is an unpublished case, and

15   there are just as many, if not more, unpublished

16   Ninth Circuit opinions affirming dismissals on a motion

17   to dismiss.  But even looking at Judge Wardlaw's

18   language in *Zindel*, which I belive is the case he was

19   probably referencing, she says:  When the similarities

20   between the two works are only an uncopyrightable

21   material or de minimis material, that it is appropriate

22   for a motion to dismiss.  And that's what's happening

23   here.  It's uncopyrightable, unprotectible similarities

24   rooted not only in common genre tropes, but also, in

25   real facts in the real world that no one can own.  And

```
 1   for that reason, this case is appropriate for dismissal
 2   with prejudice.
 3           THE COURT:  Okay.  Thank you very much.
 4           Go ahead.
 5           MR. STAM:  I would point Your Honor to, you
 6   know, the numbered paragraph that we include in our
 7   response, numbered paragraph seven, where we have a
 8   subsection there of 14 -- or 14 items that we think
 9   provide for substantial similarity.  I would note that
10   at this stage, without the benefit of discovery, without
11   the disclosure of experts, I think the standard is less
12   for us to prove that they are substantially similar in
13   an ironclad way, but more to show that they are -- that
14   they must show -- the Defense -- that they're not
15   substantially similar.  And I would just point to the
16   items in paragraph seven to underscore that fact.  And I
17   would also submit that, you know, there are similarities
18   in terms of, you know, some of the initial arrays of
19   how, you know, things play out in season one.  Again,
20   both shows feature an adult who dies in authority, and
21   then their children of the opposite gender are there,
22   and they engage in romantic sexual affairs with the
23   players that their father coached.  I don't think that
24   that's a scène à faire in the context of a survival
25   film.  And I would also underscore to some extent is,
```

1    you know, based on their logic, if I were to make a show

2    about, you know, a boy soccer team going down in the

3    wilderness and then, you know, they form a -- you know,

4    a nature-like cult and explore the issues of masculinity

5    as opposed to femininity, the issues of, you know,

6    coming of age in the context of being a man versus a

7    woman.  I think their argument would say, oh, well, you

8    know, that's not copyrightable.  You know, it's -- it's

9    just generic.  Like, you know, people get lost in the

10   wilderness.  They have conflicts with their teammates.

11   They -- they reconcile.  You know, there's a coming of

12   age aspect.  I mean, their own argument, I think, would

13   lend itself to someone just inverting some key aspects

14   of *Yellowjacket*s and saying, oh, this is all protect --

15   this is non-protected stuff.  So there has to be a line

16   somewhere.

17          THE COURT:  I think what they would tell you

18   is, go ahead.

19          MR. STAM:  Pardon?

20          THE COURT:  I think they would tell you, go

21   ahead.

22          MR. STAM:  Well, maybe they would.  But I think

23   that, you know, at a certain point, there are distinct

24   elements, overlays, plots, and sequences in terms of the

25   way they're structured that make it work -- you know,

1    that is difficult to argue they're not substantially

2    similar in a core way.

3              THE COURT:  I mean, just in essence, what is it

4    that you think you own?

5              MR. STAM:  I think it's the idea of the soccer

6    team or the sports team going down and then turning on

7    each other while the -- you know, while the bonds --

8    well, basically there's a breakdown and a decline --

9    collapse in authority figures and, you know, essentially

10   a charismatic leader who, you know -- basically, the

11   degeneration around that kind of charismatic leader.  I

12   think the way it's arranged in terms of the sports team

13   and the way it's arranged in terms of the

14   inter-character conflicts -- and, you know in *Lord of*

15   *the flies* there was no romantic tension.  They were a

16   bunch of fifth grade boys.  So, you know, I'm -- I'm

17   sympathetic to the arguments here, but I think that

18   given the law and these substantial similarities that do

19   exist at the pleading stage, it's just not right for

20   dismissal, but that's just my take, Your Honor.

21             THE COURT:  Okay.  Appreciate it.  Thank you.

22             Do we need anymore?  What is it?

23             Go ahead.

24             MS. FREEMAN:  Well, I was going to say, I'm

25   happy to rebut each of those pieces in point, but if

21

1    Your Honor has heard enough...

2            THE COURT:  I think I've heard enough.

3            MS. FREEMAN:  Thank you.

4            THE COURT:  Thank you for your argument.  It's

5    submitted.  Thank you.

6                (Whereupon, proceeding adjourned.)

7                        - - -

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1              **C E R T I F I C A T E**

2

3

4

5    EDEN FILM PRODUCTION, LLC        :

6                vs.         :  No. CV 24-09851-DDP

7    LOCKJAW, LLC              :

8

9

10   I, MARIA BUSTILLOS, OFFICIAL COURT REPORTER, IN AND FOR THE

11   UNITED STATES DISTRICT COURT FOR THE CENTRAL DISTRICT OF

12   CALIFORNIA, DO HEREBY CERTIFY THAT PURSUANT TO SECTION 753,

13   TITLE 28, UNITED STATES CODE, THE FOREGOING IS A TRUE AND

14   CORRECT TRANSCRIPT OF THE STENOGRAPHICALLY REPORTED

15   PROCEEDINGS HELD IN THE ABOVE-ENTITLED MATTER AND THAT THE

16   TRANSCRIPT PAGE FORMAT IS IN CONFORMANCE WITH THE REGULATIONS

17   OF THE JUDICIAL CONFERENCE OF THE UNITED STATES.

18   FEES CHARGED FOR THIS TRANSCRIPT, LESS ANY CIRCUIT FEE

19   REDUCTION AND/OR DEPOSIT, ARE IN CONFORMANCE WITH THE

20   REGULATIONS OF THE JUDICIAL CONFERENCE OF THE UNITED STATES.

21

22   _____/S/_____     _06/27/2025_

23   MARIA R. BUSTILLOS         DATE
      OFFICIAL REPORTER

24

25